```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
            Plaintiff,          .  CR No. 21-0035-05 (EGS)
                                .
      v.                        .
                                .
JACK WADE WHITTON,              .  Washington, D.C.
                                .  Monday, April 12, 2021
            Defendant.          .  1:00 p.m.
. . . . . . . . . . . . . . . .
```

```
                TRANSCRIPT OF DETENTION HEARING
                      VIA VIDEOCONFERENCE
          BEFORE THE HONORABLE EMMET G. SULLIVAN
                UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For the Government:          COLLEEN D. KUKOWSKI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           BENJAMIN B. ALPER, ESQ.
                             Weintraub & Alper, P.C.
                             1355 Peachtree Street NE
                             Suite 1250
                             Atlanta, GA 30309
                             (404) 892-2000


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                        P R O C E E D I N G S
 2              THE DEPUTY CLERK:  Your Honor, this is Criminal
 3    Action 21-35, United States of America versus Jack Whitton.
 4    The parties on the line, please identify yourselves for the
 5    record, and we'll start with government counsel, please.
 6              MS. KULOWSKI:  Good afternoon, Your Honor.
 7    Colleen Kukowski for the United States.
 8              THE COURT:  Good afternoon, counsel.
 9              MR. ALPER:  And good afternoon, Judge.
10    Benjamin Alper on behalf of the defendant.
11              THE COURT:  Good afternoon.
12    And, Mr. Whitton, how are you this afternoon, sir?
13              THE DEFENDANT:  I'm okay.  Thank you.
14              THE COURT:  Good.
15    Okay.  The government is appealing the magistrate's
16    decision to release Mr. Whitton.  I've read everything.
17    I recognize that there were some videos that were filed this
18    afternoon and over the weekend, and let me just inquire of
19    defense counsel if you've had enough opportunity to consider
20    those videos.  You didn't ask for more time, but I just raise
21    the issue because if you want some more time to respond in
22    writing, I'd be delighted to give you more time.
23              MR. ALPER:  That's fine, Judge.  I've had enough time.
24    Thank you.
25              THE COURT:  All right.
```

1          Ms. Kukowski, if you wish to summarize your principal

2     points, please go ahead.

3          MS. KULOWSKI:   Thank you, Your Honor.

4          In short and in summary, what I would say here is that

5     the defendant represents or is an articulable threat and poses

6     a danger to the community.  The Court has had the opportunity

7     to read the government's pleadings and view the government's

8     video exhibits, and what is clear here is that that the

9     defendant very much was amongst the instigators of a melee

10    that occurred at the U.S. Capitol at the Western Terrace at

11    approximately starting 4:28 p.m. on January 6th.

12         As a result of his actions, which included assaulting an

13    officer with a crutch then driving that officer out in the crowd

14    by the head and neck by the officer's helmet where the officer

15    was subsequently beaten with a flag pole, not only that officer

16    sustained injuries, but then other officers were also then

17    subject to additional assaults.

18         One of the other individuals who body-worn camera footage

19    shows the defendant kicked at as he was laying on the ground,

20    Officer A.W., was also subsequently pulled into the crowd and

21    was assaulted.

22         And a third individual, a third officer who was at the

23    front police line trying to rescue the individual who the

24    defendant dragged in the crowd, that individual being Officer

25    B.M., that third officer was then subsequently also assaulted

1    as he reached forward and tried to save the individual,

2    Officer B.M., that was being dragged out into the crowd.

3         What is particularly concerning about the defendant

4    is what we know to be his state of mind and his intent, and

5    then his continuing thoughts afterwards where he boasted

6    to acquaintances that he "fed an officer to the people" and

7    displayed his own hands that were bloodied as a result of

8    the assault that he perpetrated.

9         And then what was most recently discovered as the

10   government continued to review video evidence was that the

11   conduct that's been charged thus far, which is very serious

12   conduct -- the charges for the assault against Officer B.M.

13   carries a sentence of up to 20 years -- that conduct is not

14   the only series of assaults that the defendant engaged in that

15   day.  And what we learned most recently is that the defendant,

16   about 20 minutes after he instigated and started this horrible

17   melee, returned to the police line at the lower Western Terrace,

18   kicked at officers once again and told officers that they were

19   going to die that night.

20        And that there, combined with what we, as I said, know was

21   the defendant's continued state of mind and continued callous

22   disregard for officers' lives, is why he should be detained, as

23   he poses a clear threat and danger to the community.

24             THE COURT:  Let me just inquire, counsel:  Are

25   you in the position to show the videos and just circle this

1    defendant and what he was doing?

2              MS. KULOWSKI:  Yes.

3              THE COURT:  All right.  Go right ahead, counsel.

4              MS. KULOWSKI:  Thank you, Your Honor.

5         Court's indulgence as I share my screen and what is going

6    to be marked as Government's Exhibit 1 in the government's

7    initial emergency appeal.

8              THE COURT:  All right.

9              MS. KULOWSKI:  And so can the Court see the full

10   video here?

11             THE COURT:  Yes, I can.

12             MS. KULOWSKI:  So I'll start it from the beginning.

13   It's currently queued up at the 1-minute mark, and I'm going

14   to circle the defendant here with my cursor.  The defendant's

15   an individual wearing an olive green jacket with a red vest

16   underneath -- you can see a little bit of that red vest -- a

17   baseball cap where the back of the baseball cap is white, and

18   then a gray backpack.

19             THE COURT:  All right.

20             MS. KULOWSKI:  I'll start this from the beginning.

21        (Video played.)

22        And so now I've got it paused at 3 seconds.  And so

23   the original video file here has just zoomed in, and you see

24   the defendant at this point, he is currently behind a metal

25   railing that had been set up.  Again, you see his jeans

underneath of a red underlayer that he had his olive jacket and
baseball hat and backpack.  And at this point you see the crutch
that he's using to stab at Officer B.M. here in his right hand.

Restarting at the 3-second mark.

(Video played.)

Now I've got it paused at the 15-second mark.  This
right now is where you see the defendant -- again, most easily
recognized by the white hat at this point -- reach out and the
officer, Officer B.M., has just been knocked down and is about
to be pulled out into the crowd by the defendant.

This moment is going to be very, very clear when the Court
watches what will be Government Exhibit No. 3, the body-worn
camera of Officer C.M., who is standing directly behind Officer
B.M.  I'm going to restart at 15 seconds.

(Video played.)

Now I've got it paused at the 22-second mark.  And the
defendant, along with at least one codefendant of his who the
Court can see here in the tan jacket, helmet, and teal backpack --
that's his codefendant, Jeffrey Sabol -- have just succeeded in
dragging Officer B.M. in a prone position down the stairs.

And I'll draw the Court's attention to what the Court
sees here is an upside-down American flag.  What the Court will
see in a few moments, that the third codefendant, Peter Francis
Stager, is about to start beating Officer B.M. with that flag.
I'll restart at the 22-second mark.

1    (Video played.)

2    And so I've got this paused at the 42nd mark.  And so

3    what's happening here and will be clear again when the Court

4    watches Officer C.M.'s body-worn camera is that Officer C.M.

5    had stepped forward to try to rescue and save Officer B.M.,

6    who had been dragged out in the crowd, and then he himself was

7    assaulted.  And then Officer A.W., who the defendant is charged

8    with kicking at as A.W. is laying down on the ground, is about

9    to be pulled out into the crowd as well.

10    Restarting at the 41-second mark.

11    (Video played.)

12    And so I've got it paused at 47 seconds.  So Officer A.W.

13    had just been pulled out in the crowd, and then here you can

14    see yet another codefendant, Codefendant Lopatic, is now striking

15    at Officer C.M.  So that is the video footage that was posted to

16    social media showing an overall view of the assaults from the

17    crowd.

18    What I want to show now is the body-worn camera footage

19    of two of the officers, Officer A.W., who is, as I mentioned,

20    who the defendant kicked at while he was on the ground, and then

21    Officer C.M.

22    I'll note for the Court that the Court will not see

23    Officer B.M., the individual that the defendant hit with the

24    crutch and then dragged in the crowd.  His body-worn camera

25    footage is not available because it was stolen by a codefendant.

1    So that's why the Court's not going to see his footage.

2              THE COURT:  All right.

3              MS. KULOWSKI:  Switching files here.

4         Okay.  Now, can the Court see Government Exhibit 2?

5              THE COURT:  Yes, I can.

6              MS. KULOWSKI:  This is the body-worn camera footage

7    of Officer A.W., which I'll start at the beginning here.

8         (Video played.)

9         So I've got it paused at the 24-second mark, and I'm going

10   to back it up a couple of frames here.  And so what the Court

11   will see in the top-left screen here -- for the record, the

12   minute marker is at 24 seconds -- is the defendant again with

13   his outstretched right arm and the crutch in his hand, and you

14   can see his ball cap here with the white background of his ball

15   cap.  I'll restart at the 24-second mark.

16        (Video played.)

17        So I've got it paused at 29 seconds.  Just to orient the

18   Court, at this point Officer A.W. is laying on his back on the

19   ground in the middle of the archway there at the lower West

20   Terrace.  Restarting at the 29-second mark.

21        (Video played. )

22        Pausing at 31 seconds.  Again, you see the defendant here

23   on the bottom-left corner of the screen.

24        Restarting at the 31-second mark.

25        (Video played.)

1    Pausing at 34 seconds.  And so what the Court has just seen
2    is that Officer A.W.'s baton has just been snatched out of his
3    hands, and the next couple of seconds what you'll see is that
4    he's still on the ground.  And the Court will see the defendant
5    reach and grab officer B.M. over top of Officer A.W. laying on
6    the ground and drag Officer B.M. out over top of Officer A.W.
7    into the crowd.
8        So I'm going to restart it at the 24-second mark.
9        (Video played.)
10        Pausing at 37 seconds.  And this is where the defendant
11    is kicking Officer A.W. who's on the ground without his baton
12    and I would submit without any form of defense.
13        I'll restart at 37 seconds.
14        (Video played.)
15        And then pausing at 43 seconds.  What the Court just
16    saw there was the defendant dragging Officer B.M. out over
17    top of Officer A.W.  Restarting at 43 seconds.
18        (Video played.)
19        And I'll pause at 1 minute and 15 seconds.  And at this
20    point Officer A.W. is being dragged out in the crowd, and I'll
21    submit what Officer A.W.'s body-worn camera shows amongst other
22    things is what the defendant started in the aftermath of that,
23    because of the melee he started, because he chose to climb over
24    that railing with the crutch in his hand and start assaulting
25    Officer B.M. and then dragging Officer B.M. out into the crowd,

that started a whole chain of events that led to Officer A.W. being dragged out in the crowd and assaulted, and then Officer C.M. being dragged out in the crowd and assaulted.

Now I'll stop sharing Government's Exhibit 2 and load Government's Exhibit 3, which is the body-worn camera footage of Officer C.M. who is standing directly behind Officer B.M. when he was dragged out. And this will be the body-worn camera, Your Honor, that's going to most clearly show the defendant as he first starts assaulting Officer B.M. with a crutch and then drags him out by the head.

And I apologize to the court reporter. I just see a message now that I'm speaking a little bit too quickly, so I will attempt to slow down.

All right. So starting with what's going to be Government's Exhibit 3, Officer C.M.'s body-worn camera footage.  (Video played.)

So I've got it paused at the 35-second mark down here at the bottom. And if the Court sees the top right-hand screen, just to orient the Court, the time stamp here is 16:27, 4:27 p.m. and 26 seconds. And so in about four seconds here is when you'll see the defendant drag Officer B.M. out into the crowd. So restarting for the record at the 35-second marker.

(Video played.)

So I've got it paused at 41 seconds here, and so what you see now is the defendant. Again, you see that olive green

1   jacket, his backpack, his baseball cap with that white brim

2   with his hand on Officer B.M.'s helmet, dragging Officer B.M.

3   what will be in a prone position out into the crowd over top

4   of Officer A.W.  This is Officer A.W. down here at the bottom

5   of the screen who you see wearing the reflective MPD jacket.

6        Restarting at the 41-second mark.

7        (Video played.)

8        Now, pausing here again at the 41-second mark, just to

9   orient the Court, you see the crutch here that is now atop

10  Officer B.M. that the defendant was initially using, and again

11  you see that baseball hat, that red coat underneath the red

12  jacket underneath the olive green jacket and the backpack.

13       Restarting at 41 seconds.

14       (Video played.)

15       And so I've got it paused at 45 seconds, and here the

16  defendant has succeeded in dragging Officer B.M. out in the

17  crowd.  You can see where Officer B.M. is located down here

18  in the center of the screen, and then others at this point

19  have joined into this series of assaults.

20       You see a codefendant, Defendant Mullins, reaching for

21  Officer A.W.'s leg.  And what you'll see in just a couple more

22  seconds is Codefendant Lopatic is going to rush up and be

23  amongst the individuals that's going to assault Officer C.M.

24       I've got it paused here at the 1-minute and 8-second mark,

25  and at this point the Defendant Lopatic has knocked off Officer

1     C.M.'s body-worn camera.

2          I've played these exhibits and shown and discussed assaults

3     that happened after the defendant dragged Officer B.M. into the

4     crowd and after he kicked at Officer A.W., because what I think

5     is key here is that the defendant isn't someone that rushed into

6     an assault that was already occurring or took advantage of what

7     others started to join into a melee.

8          He himself was the instigator.  And he himself, when he

9     climbed over that railing with the metal crutch in his hand,

10    is very much the reason why all these assaults were able to

11    happen, and happened in such quick succession.  I'm going to

12    stop sharing the screen here.

13         What I'd like to share now are exhibits that were

14    identified over the weekend and provided to defense counsel,

15    and then to the Court, of a separate assault that the defendant

16    participated in.  And I'll note, this is not charged yet.

17         Approximately 20 minutes after the assaults on Officer B.M.

18    and Officer A.W. -- for context, the scene of these assaults

19    at the lower West Terrace of the Capitol was the site and focal

20    point of what frankly is a sustained battle that started in the

21    early afternoon and continued until just after 5:00, when police

22    were finally able to clear the area and continue clearing the

23    Capitol Building itself.

24         And what I want to emphasize is these officers watched

25    their colleagues get assaulted, and they had to stay there

and continue not only trying to render aid to their injured and assaulted colleagues, but also then themselves continuing to protect that line and that entryway to the Capitol, and then sustained subsequent assaults themselves.

And so what you'll see here, this clip is actually a clip from an officer who was there initially when Officer B.M. and Officer A.W. and Officer C.M. were all assaulted.  That officer was not assaulted himself or herself, but stayed in that police line, and it's twenty minutes later when his or her body-worn camera footage captures this new assault that was identified by the defendant.

Before I play it, I will acknowledge to the Court and to help the Court understand, the defendant isn't as clearly visible here, and I'll be able to point out his clothing in ways in which we do believe it is him; but you're going to be viewing the footage through a somewhat opaque or transparent police shield.

It's only when the footage is then paired up with surveillance footage from the U.S. Capitol Police that had mounted a camera there in the tunnel that the Court can see for certain that it is the defendant, and most importantly I think for purposes of this hearing, understand that it is the defendant that was the one that uttered the words to law enforcement, "You're going to die tonight."  So court's indulgence as I set this up.

1    So for purposes of this hearing, this will be marked as

2  Government Exhibit 4, the body-worn camera footage of Officer

3  D.P.  And so to help the Court understand, particularly when

4  we look at the surveillance footage, I'll draw the Court's

5  attention to this individual here who's in jeans, in a somewhat

6  faded red shirt, standing in front of the police line.

7    The Court's going to hear this person is advising the

8  rioters, of which Whitton is one of them, to stop.  And that

9  individual will be clearly visible in the surveillance camera

10  footage as well.

11    So now I'm going to start this from the beginning here.

12  And the Court can see this happens at 16:48 hours, 4:48, so

13  actually almost 20 minutes exactly after the initial set of

14  assaults.  (Video played.)

15    So I've got it paused at the 5-second mark here.  And

16  I'll draw the Court's attention, and I'm going to circle with

17  my cursor the defendant here again in that baseball cap, which

18  the Court will see it has that white back there.  And here you

19  see the red under-jacket, and you're going to see the backpack

20  straps both along the defendant's shoulders and along the

21  defendant's waist.  I'm going to restart at 5 seconds.

22    (Video played.)

23    Pausing here for the record at the 8-second mark.  So you

24  see the defendant's been kicking again at the officers, wearing

25  jeans and boots, which I will submit are consistent with the

1    jeans and boots that we saw him wearing when he was kicking

2    at Officer A.W. as Officer A.W. was laying on the ground.

3         We'll restart at the 8-second mark.

4         (Video played.)

5         Pausing at 14 seconds.  So the Court sees the defendant

6    down here again, and the jeans, that red jacket with the

7    backpack, and the baseball cap.  What he's going to do is run

8    back up to the police line, kick it down, and that is when

9    he's going to yell, "You're going to die tonight."

10        Restarting at 14 seconds.

11        (Video played.)

12        So I've got it paused at 34 seconds, and the Court can see

13   here the defendant as he runs back down the steps wearing that

14   red jacket and his backpack there.  So that's what will be

15   Government's Exhibit 4.

16        And now what I'll do is jump to what will be Government's

17   Exhibit 5, which is the surveillance camera from U.S. Capitol

18   Police.  Can the Court see the blue back-screen of the video

19   footage here?

20             THE COURT:  Yes.

21             MS. KULOWSKI:  Okay, great.  Let me restart it, then.

22        So for the record, this is going to start at 16:48:38,

23   which is going to be, I believe, the camera footage from Officer

24   D.P., starting at 16:48:51.  So it's going to be backed up just

25   a little bit, and I'm going to restart here.

1      (Video played.)

2      And I'm going to pause at the 1-second mark.  And so

3  what the Court can see here is that individual that I pointed

4  out initially in the body-worn camera with the faded red shirt,

5  who subsequently puts himself between the police and the

6  rioters.  I'll restart at 1 second.

7      (Video played.)

8      So pausing at 8 seconds.  And so now that individual has

9  turned, which is consistent with how we saw him in the body-

10  worn camera footage of Officer D.P.

11      (Video played.)

12      Pause at 12 seconds.  I'm going to draw the Court's

13  attention to -- it's a little slight here, but what you see

14  is the defendant's hat right here.  It's that with the white

15  back, and then it's got the blue and the red on the front as

16  he walks up towards the police line.

17      I'm just going to back it up a few frames.  So here again,

18  what you see, Your Honor, circling with my cursor, is the

19  defendant with his hat, his backpack, and his red under-jacket.

20      Restart at the 13-second mark.  Pausing it at 13 seconds

21  again.  And you see he's walked up the line, which is consistent

22  when you first saw him come up and kick at the line of police

23  officers.  (Video played.)

24      I've got it paused at the 15-second mark.  So the Court

25  just saw when he kicks at that line and proceeded back towards

1    the steps, and again that individual with that faded red jacket

2    is standing there in between the rioters and the line of police

3    officers.  So I'll restart at 15 seconds.

4         (Video played.)

5         Pause at 26 seconds.  And what you'll see down here is the

6    defendant with that red jacket, and it's a little difficult to

7    see at this point, but you see the very brim of his cap.  And he's

8    going to run back up towards the officers again, and this is

9    when, consistent with the body-worn camera, we see him as he was

10   making that threatening statement, "You're going to die tonight."

11        (Video played.)

12        And pausing at 43 seconds.  And so consistent with what

13   we saw on the body-worn camera footage, this is when he turns

14   to run back down the steps with the backpack, the white back

15   of the hat, and that red undercoat vest.

16        And I'll restart at 42 seconds.

17        (Video played.)

18        All right.  So for the record and what's Government's

19   Exhibit 5, at the 52-second mark, the last video clip that

20   I do want to share is very brief --

21        THE COURT:  Can I just interrupt you for a second?

22   It may just be me, but I could not hear any utterance.

23        MS. KULOWSKI:  There's no audio in the Capitol

24   Police camera footage.  The only audio that you hear is in

25   the body-worn camera footage, where you actually hear the words.

1          THE COURT:  All right.  Thank you.

2          MS. KULOWSKI:  The last file that I do want to show

3     just briefly is going to be Government's Exhibit 6, and this is

4     a video that was sent by the defendant to acquaintances.  And

5     the reason why I want to show it is because it shows the lower

6     West Terrace, and at this point it's early evening.  By my best

7     guess, I would say that this is shortly after 5 p.m., or near

8     5 p.m., and the Court can see the state that the lower West

9     Terrace is in at that point.

10          But what I also want to highlight is that it shows that he

11    engaged in the initial assaults, the charged assaults, and then

12    he engaged in the second round of assaultive conduct 20 minutes

13    later.  And then here the Court can see he still stayed on the

14    scene.  Let me just show Government's Exhibit 6 briefly.

15          (Video played.)

16          So, for the record, I've got it paused at 9 seconds,

17    and I think that's sufficient for the government's purposes.

18    What the Court can see is he's still here at this archway at

19    the lower West Terrace, which has been, for the most part,

20    cleared by law enforcement.

21          You can see the various law enforcement officers and see

22    that it is indeed later in the evening, or early evening, that

23    the lights have started to come on amongst the Capitol, and that

24    it took until then for that lower West Terrace to actually

25    become clear.

1    THE COURT:  Counsel, can you take me back to the

2    footage that shows what the government contends is an utterance

3    from this defendant, because I missed it.

4    MS. KULOWSKI:  Absolutely.  Court's indulgence as

5    I pull that file up.

6    THE COURT:  And if you could, for the record, just

7    let the Court and everyone know where that utterance appears

8    on the footage.

9    MS. KULOWSKI:  Absolutely.  So it's going to be in

10   what was Government's Exhibit 4, the body-worn camera footage

11   of Officer D.P.  I'll play through so the Court can hear it,

12   and then I'll give the timestamp and back it up so the Court

13   can hear it again.

14   THE COURT:  Great.  Thank you.

15   MS. KULOWSKI:  So I've got it right now at the

16   4-second mark, which is at 16:48:62.

17   (Video played.)

18   I've got it paused at 34 seconds based upon the clip

19   timestamp, which is atop -- the actual time was 16:49:21,

20   4:49 and 21 seconds.  And so what I would submit the Court just

21   heard was the defendant state, "You're going to die tonight,"

22   and that's his backpack and red jacket and jeans running back

23   down.  So I'm going to play this clip, just backing it up just

24   a few seconds.

25   So I've got it backed up about two seconds here, pausing

1    at the 33-second mark.  I probably should have backed it up

2    further.  Okay.  So, for the record, I'm going to restart at

3    the 28-second mark down here of the running time of the clip.

4    The body-worn camera reflects that it's 4:49:16 at this point.

5         (Video played.)

6         Paused at 34 seconds.  And if Court had trouble hearing

7    that, I can actually play it at a half speed, if that helps.

8              THE COURT:  Sure.  That's fine.  Please do.

9         (Video played.)

10             MS. KUKOWSKI:  So, for the record, I backed it up

11   to the 28-second mark, and I've got the video playing at half

12   speed.  I'll restart it now and pause at the 33-second mark.

13        (Video played.)

14        And I don't know if that was helpful or not.

15             THE COURT:  Yes, it was.  Thank you.

16             MS. KULOWSKI:  So I would submit, Your Honor,

17   that statement, "You're going to die tonight," coupled with the

18   defendant's statements to his acquaintances where he discusses

19   having sent a, quote, bad cop to the people, and not caring or

20   knowing about that, quote, bad cop's status, shows that the

21   defendant is a continued threat and danger to the community

22   and that he should be held.

23             THE COURT:  All right.

24        Does the government anticipate a superseding indictment?

25             MS. KULOWSKI:  It does, Your Honor.  There are

1    additional charges, I think, not just for the defendant here,

2    but for codefendants as well that have been identified.

3            THE COURT:  All right.  I'll just leave it at

4    that.  All right.  Thank you very much.

5        Mr. Alper?

6            MR. ALPER:  Thank you, Judge.  Could I ask

7    Ms. Kukowski to unshare her screen?

8            MS. KUKOWSKI:  Yes.

9            MR. ALPER:  Thank you so much.

10       First of all, Judge, I want to extend my sincere thanks

11   to you, to Mr. Coates, to your whole staff.  You guys have

12   been so phenomenal in dealing with me this past week in getting

13   me admitted.  It's not always easy to do that, but you've got a

14   great team.  So I want to thank you so much.

15           THE COURT:  If you had the $200, it's easy, counsel,

16   so -- (laughter) -- it's our pleasure.  We can always use some

17   new lawyers in our bar, so welcome to the court.

18           MR. ALPER:  Thank you, sir.  Thank you, sir.

19       I think what this all boils down to is, essentially, the

20   decision Your Honor has to make is whether the very serious

21   allegations against Mr. Whitton render him ineligible for a

22   bond just in and of themselves, because there's nothing in

23   Mr. Whitton's background or history to suggest that he's

24   presently, today, April 12th, a danger to the community or

25   to any individual.

1      He is 30 years old.  He runs and operates a successful

2  local business that employs several people in the community.

3  He's not a member of any proud-boy group or antigovernment

4  militia.  There's no evidence that his activities or his

5  actions, alleged actions, were coordinated, premeditated,

6  planned in advance.

7      You know, nothing in the video shows any kind of tactical

8  gear that some other defendants have been wearing: you know,

9  helmets or body armor or zip ties, nothing of that nature.

10  There was no evidence of any social-media post before the

11  January 6th riots or after where Mr. Whitton is claimed to

12  have espoused violence or that he was traveling to D.C. to

13  commit harm against anyone.

14      When they searched his home, there was one firearm there

15  which has since been removed, which he was legally allowed to

16  possess, and I'm not aware that they found anything when they

17  did the search of his home that would indicate that he's a

18  current present danger to the community.

19      We submitted, which I know Your Honor has received,

20  over 40 affidavits and letters that attest to Mr. Whitton's

21  character and that are shocked by this alleged behavior.

22  I think it's considered completely out of his nature.

23      And that's pretty remarkable.  I got those in about

24  two days, Judge.  I usually don't have that many affidavits

25  or letters when I have months to get ready for a sentencing

hearing.  A lot of times people don't want to write them.
But we were able to get that very quickly in front of Your
Honor, and that's also information that Magistrate Judge Cannon
did not have at the initial detention hearing where she did
grant him a bond.  So that's even more evidence that I think
should factor into Your Honor's determination as to whether or
not he should be released and whether or not Your Honor should
agree with Judge Cannon's order.

It's also important to note, Mr. Whitton was willing
to speak to law enforcement as early as February 5th.  He
was contacted by the FBI.  I reached out to them and explained
that I was representing him.  I asked to get a prosecutor
involved, get a proffer letter, and they said they would check
on that and get back to me.  I also told them he was prepared
to voluntarily surrender if there were charges against him, and
the agent indicated that he would convey that message to whoever
needed that.

So he was willing to talk to them.  He was willing to
surrender to them through counsel.  And I think, again, that
weighs heavily in favor of his pretrial release and the fact
that he is not a present danger to the community.

As Your Honor knows, to support detention based on
dangerousness, the government has to prove by clear and
convincing evidence that there is a real threat, clear threat,
to an individual, to the community presently.  I don't think

they can show that.

Again, these are very serious allegations.  Nothing that I say diminishes that.  But the question is whether or not he is now a danger to the community, and I don't think the government has met their burden in that instance.  So I'd ask Your Honor to adopt the bond order set by Judge Cannon and allow him to be released pending trial.

THE COURT:  Your client has no prior criminal history, correct?

MR. ALPER:  He has a very minor criminal history, three misdemeanors over a thirty-year lifespan.  The most recent was driving with a suspended license.  Prior to that, there was a criminal trespass in [Indiscernible] County, Georgia.  That was several years ago.

That involved him fishing in a place where he thought he was allowed to fish and he couldn't.  It's got nothing to do with a riot at the Capitol.  So I don't think his criminal history would in any way --

THE COURT:  I'm sorry.  I meant to say no prior felony record.

MR. ALPER:  Correct, Judge.

THE COURT:  Ms. Kukowski -- let me ask government counsel:  So these cases are difficult because, on the one hand, you have letters from family members and friends that essentially say the person I'm writing about is a pillar of

our community and we're shocked to hear that he was involved

in this incident in some way on January the 6th.

All right.  Accepting that those people who wrote the

letters are indeed speaking the truth, and I have no reason

to think that they aren't, why hasn't the danger element been

ameliorated going forward?

MS. KULOWSKI:  I think here, Your Honor, what the

Court needs to look at are two things:

One, this was a rather unprecedented historical event

that happened here, where forces convened at the U.S. Capitol

and attempted to essentially stop the functioning of the

government that day.  So what gave rise to this incident in

and of itself is somewhat remarkable.

But I would also submit that what brought the defendant

there, which would be a desire to at this point, as the Court

can see, try to enter the Capitol and interfere with the lawful

function of government is something that is continuing to go

on today.  The government that he was fighting is still our

present government.

The individuals that he and members of the crowd were

battling against, and the fact that they were there in support

of former President Trump, all those factors are still at play.

And we still can see continued unrest, continued protests.

And I think the conditions that were present on January

6th, while it may not be the exact same in that there may not

1   be thousands of people marching down the National Mall and

2   Pennsylvania Avenue down to the Capitol, there is still much,

3   I think in the most mild sense, dissatisfaction with the state

4   of the government and what happened in January through the

5   present with the change of administration.

6       And I would say that the defendant here purposely chose

7   to act violently and then continued to reengage in it.  And

8   the fact that there were those multiple instances, and then

9   the fact that there were those comments that he made to others

10  days afterwards where he continued to express disregard for

11  the lives of law enforcement, law enforcement that's going to

12  continue to be tasked with protecting the Capitol and protecting

13  the function of the government, and the fact that he espoused

14  that he was going to stay off of social media for a period of

15  time, I think shows that he still holds these views and there's

16  still opportunities for him to inflict danger not only to the

17  functioning of the U.S. government, but also on law enforcement

18  who are sworn to protect them and stand in front of members of

19  the government and others in protection of them and put themselves

20  between the defendant and our government.  So I think there's

21  still plenty of opportunity for him to continue acting out.

22      What you don't see on his part that you see with many other

23  defendants are statements of remorse or statements of renouncing

24  the values that brought him there that day.  And so with that in

25  mind, and knowing that he continued to be so callous with regard

1    to the lives of law enforcement, I think he does continue to

2    present a danger to the community.

3            THE COURT:  Thank you, counsel.  Mr. Alper?

4            MR. ALPER:  Judge, may I respond to that?

5    I agree with Ms. Kukowski that this was a very rare and unusual

6    event that is not likely to reoccur, hopefully ever, obviously,

7    in our country's history:  There was a riot.

8        There's a reason why we have the phrase "mob mentality,"

9    because crazy things happen when these events occur.  And that

10   is not going to happen again with Mr. Whitton.  He has not,

11   again, expressed any views that would indicate that he is

12   violent by nature or violent towards law enforcement.

13       Again, prior to January 6th or since, I believe his

14   willingness to cooperate with law enforcement, to turn himself

15   in if asked to, shows his lack of dangerousness in the community,

16   and I don't believe that presently anything that the government

17   has shown this court suggests that he is an ongoing danger to

18   the community.

19           THE COURT:  Let me just inquire:  This is an

20   interesting issue.  I hadn't thought about this before the

21   hearing, but Ms. Kukowski raised an interesting point.

22       You say that we've not heard any comments from the

23   defendant about remorse, being sorry that he got dragged into

24   this scenario.  But by the same token, the defendant's under

25   no obligation to say anything at all.  So can we really hold

1      that against him because he hasn't said "I'm sorry"?

2                 MS. KULOWSKI:  I think, Your Honor, what the Court can

3      take into consideration there, the defendant doesn't necessarily

4      have to say I'm sorry that I assaulted Police Officer B.M. or

5      A.W., but what we don't see is a renouncement of January 6th

6      and the violence against the government or any of the movement

7      that led to that.  And that's what concerns the government,

8      is that the defendant still has that mentality and he still

9      is capable of posing a threat.

10                THE COURT:  All right.  I got it.  All right.

11     I'm going to issue a written opinion.  These are very serious

12     issues that have been raised.  They're very important, obviously,

13     to not only to Mr. Whitton but to the community as well, and

14     these issues are -- you know, these issues go to the very --

15     well.  I'm not going to say any more other than I'm going to

16     issue the appropriate opinion, and you'll see all my thoughts

17     and my rationale for whatever decision I make.

18         We do have another hearing scheduled.  I did recognize

19     at the last hearing involving Mr. Sabol that all the defendants

20     would be joined -- well, they're joined in an indictment.

21     They'll be joined in a hearing soon, and my understanding

22     is that either today or the next day the government will file

23     a motion to exclude time from speedy trial calculations.

24         The defendants will have a chance to respond, and the

25     Court anticipates resolving that issue before -- strike that --

that issue *at* the next hearing, not before the next hearing.

With respect to the bond issue involving Mr. Whitton, the Court anticipates resolution and a published opinion within the next couple of days.  I don't have anything further to say at this point.

Mr. Alper, do you have anything else you wish to make a part of the record, sir?

MR. ALPER:  No, Your Honor.  Thank you very much.

THE COURT:  Sure.  And, again, welcome to the court.

Your client is not at D.C. jail.  Is that correct?  Or maybe he is.

MR. ALPER:  He's not, Judge.  He's in Lovejoy, Georgia, where they house our federal pretrial detainees.

THE COURT:  I see.

MR. ALPER:  We did submit a motion that Your Honor granted and a proposed order keeping him where he is until Your Honor rules on the bond issue.

THE COURT:  It's quite a marathon route that one takes to get from one facility to another.  And I'm glad you thought about that one, because he would still -- I mean, with all due respect to the marshals, they have their hands filled with lots of matters, but it takes a while to get people from one facility to another.  And I guess we'll have to cross -- depending on what the Court does, we may have to cross that bridge again; I'm not sure.  I just don't know, but you won't

1    let me forget it.

2         If the Court orders detention -- and I'm just going to

3    be upfront with everyone.  I'm inclined to order continuing

4    detention, but if I do, we'll have to address that issue of

5    whether or not he can remain there for pretrial purposes or not.

6    I don't have any strong feeling one way or another.  If he wants

7    to stay there, it's fine with me.

8         I mean, who knows how this case will be resolved.

9    Maybe there will be a trial.  I don't know.  Maybe there will

10   be a resolution short of trial.  But I'm certainly receptive

11   to whatever suggestions defense counsel may have with respect

12   to where Mr. Whitton should be prior to any resolution of this

13   case.

14        And it may make sense for many of these defendants to

15   remain where they are, because the logistics of getting people

16   from Georgia to here -- the West Coast is even more daunting --

17   there's significant challenges.  But we can cross that bridge

18   later.

19             MR. ALPER:  I appreciate that, Judge.  That is

20   definitely something that I will address with the Court at

21   the appropriate time.  I would very much like Mr. Whitton

22   to remain where he is because that is --

23             THE COURT:  Right.

24             MR. ALPER:  -- makes it easier for me, Judge.

25   So I appreciate you saying that.  Thank you.

1          THE COURT:  No, and I wanted to give you a heads-up,

2     too, and just be upfront with you as I try to be with everyone.

3     I'm leaning towards further detention, but I want you to start

4     thinking about what's in your client's best interest, whether

5     you bring him here -- I don't know if your client is under 23-

6     hour lockdown or not.  Probably not.  And if he were to come to

7     D.C., because of COVID and other reasons, assuming there's an

8     injunction in place, he may well be.  But that's something to

9     think about.

10          MR. ALPER:  Sure.

11          THE COURT:  So, anyway, we can cross that bridge

12     later on.  But I wanted you to start thinking about that,

13     because my inclination is to opt for further detention, but

14     I want to give you a fair opportunity to argue for whatever

15     relief you want in terms of where Mr. Whitton should remain

16     prior to resolution of this case.

17          MR. ALPER:  Thank you, sir.

18          THE COURT:  Sure.  All right.  Mr. Whitton and

19     everyone else, take care.

20       I'm sorry.  Ms. Kukowski, anything further?

21          MS. KULOWSKI:  Nothing further, Your Honor.

22          THE COURT:  Yeah, I don't know if the government

23     would have a view.  If the Court ultimately detains Mr. Whitton,

24     do you think the government would have a view about where he

25     should be in terms of being detained?

1           MS. KULOWSKI:  No, Your Honor.  I mean, I frankly

2      would actually echo Mr. Alper's sentiments.  I'd rather him

3      be able to have access to his client and have conversations

4      that would facilitate the case continuing to move forward.

5           THE COURT:  Well, that's right.  Mr. Alper, you're

6      in Georgia, aren't you?

7           MR. ALPER:  Yes, sir.

8           THE COURT:  Okay.  All right.  I'm thinking you're on

9      Connecticut Avenue.  Okay.  All right.  That's another reason to

10     be able to meet face-to-face with your client, or as close as

11     face-to-face as you can, given the pandemic.

12          MR. ALPER:  Exactly.

13          THE COURT:  I'll let you work with them and sort that

14     out, sir.

15          MR. ALPER:  Thank you.

16          THE COURT:  All right.  Mr. Whitton, you take care.

17     Everyone be safe and healthy.  I'll issue an opinion within the

18     next -- every time I pick a day, something happens.  So I'll

19     issue an opinion soon.  I'll just leave it at that.  All right?

20     Okay.  Thank you very much.  All right.  Bye-bye.

21          (Proceedings adjourned at 1:56 p.m.)

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter. *

/s/ Bryan A. Wayne
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance with U.S. District Court standing order(s) during the COVID-19 pandemic.  Transcript accuracy may be affected by the use of electronic technology, including but not limited to sound distortion or audiovisual interference.