IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES,** | ) | |
| v. | ) | Crim. No. 21cr35 |
| **JACK WADE WHITTON,** | ) | |
| Defendant. | ) | |

### REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant, Jack Wade Whitton, hereby files his Reply to the Government's Opposition to Defendant's Motion to Transfer Venue.

### ARGUMENT

Defendant moved the Court to transfer venue arguing that an examination of the *Skilling* factors makes apparent that the Defendant's trial should be transferred to ensure the Defendant receives a fair trial by an impartial jury as the Fifth and Sixth Amendments to the United States Constitution require. The Government's argument to the contrary is unconvincing. Try as it might, the Government cannot wave way the size and characteristics of the District of Columbia, the District's unique antipathy toward Former President Trump, or the extent of the local publicity to which the District of Columbia jury pool has been exposed and continues to be exposed.

1.  **Size and Characteristics of the Community**

Both the size and the characteristics of Washington, D.C. weigh in favor of transferring venue. Smaller communities have a greater risk of prejudice than larger communities. Courts have not established a bright-line rule as to when a community is sufficiently large that its size

obviates concern of a prejudiced jury. Rather, courts have looked into the overall context of a community's size. For instance, the Supreme Court has treated a parish population of 150,000 as small but a county population of about 183,000 as sufficiently large. *See Skilling*, 561 U.S. at 382; *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991). Often, the context of a community's size is intertwined with the nature and publicity of the underlying offense. For instance, the 150,000-person parish was small in the context of a highly publicized broadcast, *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), but the approximately 183,000-person county was large in the context of a murder trial in a major metropolitan area with hundreds of murders each year, nine in the county in question. *Mu'Min*, 500 U.S. at 429.

In context, Washington, D.C. is a relatively small community. It has a population of only about 700,000.[1] Although 700,000 people might be a large group in the context of a murder trial, it is not large in the context of a major, national story that had enduring consequences (such as prolonged National Guard presence) for the community. Furthermore, although the district is larger by population than Wyoming or Vermont, it is significantly smaller by area. Its small area means that its residents could not be as far removed from the events of January 6 or its aftermath as they might have been if a similar event took place in any state or even in one of many counties.

Additionally, Washington, D.C. is in some ways not a very diverse community, which is something courts value. *See, e.g., Skilling*, 561 U.S. at 382 ("Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain."). Specifically, Washington, D.C. is extremely politically homogenous. Approximately 93% of voters in Washington voted against Donald Trump, rendering it the least politically

---

[1] *See US Census, Quick Facts - District of Columbia,* https://www.census.gov/quickfacts/DC (last visited August 2, 2022).

diverse population in the country.[2]  To be sure, a juror merely being of a different political persuasion than a defendant does not automatically render that juror hopelessly biased. However, the politically charged nature of this case does render Washington, D.C.'s political homogeneity a hindrance in selecting an unbiased jury.

To support Washington, D.C.'s voting patterns as having no relevance, the Government cites *U.S. v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).  However, that case is distinguishable in at least two ways.

First, *Haldeman* involved the conviction of formerly high-ranking federal government officials for conspiracy, obstruction of justice, and perjury in connection with the Watergate scandal.  *Id.* at 51–52.  These are "'not crimes of violence and passion,' but rather legally complex white collar crimes."  *Id.* at 63 n.37 (quoting the brief for the United States).  The legally complex, white collar nature of the crimes was a major reason the court was skeptical of jury bias.  *See id.*  In contrast, Mr. McKellop is charged with violent, non-white-collar crimes.

Second, the majority believed "that a change of venue would have been of only doubtful value" because the Watergate scandal, "[s]candal at the highest levels of the federal government," was "simply not a local crime of peculiar interest to the residents of the District of Columbia."  *Id.* at 64 n.43.  Although the events of January 6 certainly had national implications and were covered nationally, they also had a much more substantive local component.  Some of the January 6 protesters were violent specifically in Washington and against members of the Washington, D.C. community.  Residents in Washington, D.C. had to put up with prolonged National Guard presence after January 6.  For these reasons, the events of January 6 had a local component that conspiracy, obstruction of justice, and perjury do not.

---

[2] *See Election results: The 2020 presidential race*, Politico.com (2021); https://www.politico.com/2020-election/results/president (last visited August 2, 2022).

Washington, D.C. is a relatively small community in the context of a major story that had enduring consequences for the community. It is also politically homogenous. These characteristics make it an inappropriate place to hold a trial with such clear political qualities.

### 2. Nature and Extent of Pretrial Publicity

The nature and extent of pretrial publicity related to the events of January 6 weigh in favor of transferring venue. The Government argues that the prejudice arising from extensive pretrial publicity is not limited to the District of Columbia. The Government's assertion does not account for the unique nature and extent of the pretrial publicity to which the District of Columbia residents have been exposed.

Although much of the media coverage of January 6 and its aftermath was national, D.C. residents had a unique local experience. First, their local media coverage augmented national coverage. Second, D.C. residents actually had to live through the subjects of that coverage. For D.C. residents, the National Guard presence, the curfew, the state of emergency, the closures of roads and public spaces, etc., were not just events they heard about if they happened to turn on the news or pick up a newspaper. These were local events that impacted D.C. residents' work and leisure. Nowhere else in the country was so impacted.

District residents have been bombarded with wall-to-wall media coverage of the January 6 events, related arrests, criminal charges and, more recently, prosecutorial outcomes. District residents have also been exposed to indirect publicity about January 6 from the government's security measures in their community. The National Guard was deployed to Washington, D.C. for more than four months after the incident.[3] The Mayor of D.C. implemented a 6 p.m. curfew

---

[3] *See National Guard troops leave US Capitol more than 4 months after January 6th riot,* FOX5 Washington DC, https://www.fox5dc.com/news/national-guard-troops-leave-us-capitol-more-than-4-months-after-january-6th-riot (last visited August 2, 2022).

limiting travel throughout the entire district.[4]  She also declared a state of emergency that lasted 15 days.[5]  The District implemented significant closures of roads and public spaces in advance of President Biden's inauguration in direct response to the violence at the Capitol on January 6.[6]  The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists who were emboldened by the "recent mob assault" on the Capitol.[7]  Every potential juror in the District was impacted by the events on Capitol Hill on January 6.

The people of Washington, D.C., have been exposed to uniquely intense pretrial publicity.  Their exposure is not comparable to exposure residents of other localities may have had.  The chances of media coverage prejudicing D.C.'s jury pool is therefore particularly high.

### 3. The Proximity of Publicity to Trial

The proximity of the publicity to Mr. Whitton's anticipated trial date weigh in favor of transferring venue.  The events of January 6 continue to be reported daily in the news.  The one-year anniversary of the event, as well as recent sentencings of high-profile January 6th defendants, have kept the matter in the forefront of local discourse.[8]  Indeed, there are almost daily stories about the congressional investigation into the events of January 6, revealing new

---

[4] Press Release, Mayor Muriel Bowser, January 6, 2021, https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today (last visited August 2, 2022).

[5] Press Release, Mayor Muriel Bowser, January 6, 2021, https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1 (last visited August 2, 2022).

[6] *DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed*; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosures-threats-national-mall/2542719/ (last visited August 2, 2022).

[7] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent domestic-extremists (last visited August 2, 2022).

[8] *QAnon Shaman Jacob Chansley gets 41 months in prison for role in Jan. 6 riot,* NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/qanonshaman-jacob-chansley-gets-41-months-in-prison-for-role-in-jan-6-riot/2885734/ (last visited August 2, 2022).

details and the failure of many people who have been subpoenaed by the congressional committee to cooperate.

The events of January 6 continue to be reported on.

### III. CONCLUSION

Based on the foregoing, Mr. Whitton has demonstrated that he faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. Therefore, Mr. Whitton's motion to transfer venue should be granted.

Respectfully submitted,

JACK WADE WHITTON

By Counsel

_____/s/_____
John C. Kiyonaga

600 Cameron Street
Alexandria, Virginia 22314
Telephone: (703) 739-0009
Facsimile: (703) 340-1642
E-mail: john@johnckiyonaga.com

Counsel for Jack Wade Whitton

<u>Certificate of Electronic Service</u>

  I hereby certify that on August 2, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties of record.

                    ____/s/_____

                    John C. Kiyonaga