**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Docket No. 1:21-cr-00035 |
| | ) | |
| v. | ) | ELECTRONICALLY FILED |
| | ) | |
| JACK WADE WHITTON, | ) | The Honorable Rudolph Contreras |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**AND NOW**, to-wit, comes Defendant, Jack Wade Whitton (hereinafter "Mr. Whitton") by and through his attorney, Komron Jon Maknoon, Esquire, and respectfully files the Defendant's Memorandum in Aid of Sentencing setting forth all factors this Honorable Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. 3553(a).

**APPLICATION OF THE STATUTORY SENTENCING FACTORS TO THE FACTS OF THIS CASE**

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

**I.    SENTENCING FACTORS UNDER 18 U.S.C.§ 3553(A)**

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors that must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. In the present case, 3553(a) factors weigh heavily towards a sentence below the recommended guidelines.

1

### A.  The Nature and Circumstances of the Offense

As part of their new year's tradition, Mr. Whitton and his long-standing paramour, Haley McLean, had plans to visit her father who resides in Florida. Prior to leaving, Ms. McLean's father requested that they cancel their trip due to his fears of COVID-19 transmission. Having no plans, Ms. McLean suggested to Mr. Whitton that they both travel to Washington D.C. Growing up in Georgia, they had never been to Washington D.C., and Ms. McLean thought that former President Trump's final speech was be a historical event. Although not interested in former President Trump or politics, Mr. Whitton acquiesced.

Without a plan, Mr. Whitton and Ms. McLean booked a hotel in the area of Capitol Hill only to formulate a plan after arrival. The following day after arrival, January 5, 2021, they became more familiar with the area, learned the event schedule for the next day, and purchased Trump attire.[1]

On the morning of January 6, 2021, Mr. Whitton woke up and took his prescribed Vyvanse. Prior to walking to the area of the ellipse, Mr. Whitton purchased numerous mini bottles of Fireball alcohol to drink throughout the day. He quickly learned that it was a longer than expected walk to the ellipse, and he was unaccustomed to the cold. Uninterested in the day's events but trying to be a good boyfriend, Mr. Whitton drank less for entertainment and more to simply get through the cold and speeches at the ellipse.

While at the ellipse, the crowd started moving in masse towards the Capitol Building. Accompanied by Ms. McLean, Mr. Whitton simply followed the large group without a clear understanding of the situation. Tired of walking, disinterested, and cold, Mr. Whitton took an Adderall pill. Sometime later, Mr. Whitton and Ms. McLean arrived in the area of the Capitol

---

[1] Mr. Whitton did not own any "Trump" related t-shirts or hats.

Building. At that point, Mr. Whitton was highly intoxicated and strongly under the influence of amphetamines. He then breached the restricted perimeter area of the Capital building, and ultimately reached the archway that provided access to the Capitol Building's lower western terrace (hereinafter "the Archway").

At the Archway, Mr. Whitton, by wrongly placing himself in the situation, witnessed a chaotic situation with a densely packed crowd, screaming voices, tear gas, and the detonation of flash-bang grenades. Additionally, Mr. Whitton was present in the area prior to, during, and after Ms. Rosanne Boyland's death. Body camera footage from Metropolitan Police Department Officer A.W. reveals that Mr. Whitton was within a few feet of a distraught man yelling "save her," "she's going to die," "she's dead," "please I need somebody...I need help." It is important to note that Mr. Whitton, through undersigned counsel, raises the aforementioned situation of Ms. Boyland merely to paint a picture of the extremely chaotic situation which is arguably unique to most others during January 6, 2021.

At the time of allocation, Mr. Whitton will take the opportunity to accept responsibility for his actions.

    **B.**    **History and Characteristics of the Offender**

    *Personal and Family Data*

Mr. Whitton was born on May 25, 1990, to Jack Wade Whitton, Sr., and Zabrina Pettijohn in Snellville, Georgia where he lived until approximately age two (2) when his parents separated. Mr. Whitton's father worked as an electrician. Tragically, he passed away at the age of 57 after overdosing on a combination of controlled substances. Mr. Whitton's mother is 65 years old and resides in Winder, Georgia where she remains unemployed. At approximately the age of two (2) years old, his mother and father separated. Mr. Whitton remembers his father being both physically

and verbally abusive towards him and his mother. This constant verbal and physical abuse eventually led to Mr. Whitton's mother leaving the marriage and moving to Winder, Georgia with Mr. Whitton. Unfortunately, the move and eventual divorce did not put an end to Mr. Whitton's unstable household and suffering.

After the separation, Mr. Whitton's father's child support money was directed to Mr. Whitton's tuition for private Christian school, leaving Mr. Whitton and his mother to live in extreme poverty and rely on food stamps as his mother was unemployed. During that time, Mr. Whitton's mother married David Lee Cope with whom she had twins, Amanda Cope and Christopher Cope, who are four (4) years younger than Mr. Whitton. His stepfather was an HVAC technician, but was terrible at managing his money, resulting in the electricity and water being shut off most of the time. Mr. Whitton recalls being a young boy and having to go to the bathroom in buckets outside in the backyard.

Having attended wealthy Christian schools, most of his peers were from high income families, making him an outcast and target for excessive bullying, which began in second grade. When coupled with his small, skinny stature, Mr. Whitton was unable to thwart the physical attacks. In fifth grade, Mr. Whitton only had two (2) shirts that he wore to school, which was the subject of relentless ridicule and bullying from his peers. By the time he was in seventh and eighth grade, he was frequently thrown in trash cans as the physicality of the bullying intensified.

To make matters worse, the already existing daily challenges he faced while staying with his mother were made far worse as his mother was strongly disliked in the neighborhood. In turn, he was treated very badly. Aside from the general disdain and comments towards his mother, Mr. Whitton recalls that one individual would shoot her with a BB gun whenever the opportunity arose. As would be expected, Mr. Whitton was consequently rejected in the neighborhood and unable to

make friends as the other children were not allowed to socialize with him. In many instances, the other children in the neighborhood were physically aggressive towards him. For example, Mr. Whitton recalls while growing up another child in the neighborhood used to chase him with a baseball bat. In another, the same neighbor had two (2) vicious dogs, one of which suspiciously attacked his sister Amanda when she was only six (6) years old. Recalling that day, Mr. Whitton remembers hearing his sister's screams and then running outside to see his sister bleeding everywhere. Mr. Whitton vividly recalls having no phone in his household and running around the neighborhood to find somebody who was willing to help. He also recalls that his sister barely survived the attack.

Aside from his great difficulties at school and in the neighborhood, Mr. Whitton witnessed his mother and stepfather's severe fights that occurred most every day (*See* Defense Exhibit A). At night, he remembers falling asleep to the sound of them fighting. When not fighting with his mother, his stepfather would physically abuse Mr. Whitton. And tragically, his stepfather's abuse escalated to other forms that affected both Mr. Whitton and others in the household. *Id.*

Although Mr. Whitton's mother was not physically abusive, she was extremely verbally abusive. Though not formally diagnosed with any psychological disorder, Mr. Whitton suspects that his mother suffered from some mental condition as a result of being physically abused by her father. In turn, Mr. Whitton has not had contact with his mother in several years as he is still trying to reconcile trauma from his childhood.

The times that Mr. Whitton spent with his father while growing up were also troubling. When Mr. Whitton was approximately 12 years old, he was forced to move in with his abusive father in Ellenwood, Georgia, due to the extreme poverty Mr. Whitton was living in with his mother. Mr. Whitton's father was more financially secure and was then able to provide him with

all material necessities. Due to the move, Mr. Whitton was only able to see his mother for two weekends per month.

At the time Mr. Whitton moved in with his father, Mr. Whitton's father lived with and eventually married Camilla Elaine Friel, who had a daughter, Hannah Maloney. Mr. Whitton and his stepsister were the same age, and they had a good relationship. Despite the newfound stability with having Hannah as his stepsister, Mr. Whitton's father continued to be physically abusive to everyone in the household (*See* Defense Exhibit B). It was particularly difficult for Mr. Whitton to witness his father's abuse of his stepmother as she was hard of hearing and suffered from mental health issues. He saw her as such an underdog and could do nothing about it.

From his earliest childhood memories of having to barricade himself in his room for protection from his father, he just could not take it any longer and attempted to run away. As time passed, Mr. Whitton grew older and stronger and began stepping in to protect his stepsister and stepmother. This oftentimes meant that he diverted the abuse to himself. *Id.*

Looking back on his childhood, Mr. Whitton describes his father as an "addict" who abused his pain medication. His father was given opiates for his pain which led to addiction. While addicted, his father increasingly became abusive. Approximately four years before his father's death, Mr. Whitton's father attacked and beat up his stepmother and his stepsister so severely he was arrested, and a protective order was filed (*See* Defense Exhibit C). Before his father's death, Mr. Whitton did not have much contact with him; however, he would loan his father money occasionally. Since his passing, Mr. Whitton has struggled to cope with his mixed feelings.

Through the years, Mr. Whitton has maintained a good relationship with his stepsister, Hannah, whom he speaks with regularly. Sadly, Mr. Whitton believes that she was diagnosed with Post-Traumatic Stress Disorder from living with his father. Mr. Whitton's half-sister, Amanda,

age 28, currently resides in Salt Lake City, Utah and is a teacher. Mr. Whitton's half-brother, Christopher Cope, also age 28, resides in Melbourne, Florida where he is enrolled in college and employed as a security guard. Although Mr. Whitton does not communicate with his half siblings on a regular basis, he is proud to say that his brother just had a baby, and his sister is now engaged.

Mr. Whitton is single and does not have any children. However, he has been in a serious, healthy relationship with Haley McLean, age 31, for approximately six years. Ms. McLean resides in Locust Grove, Georgia and is currently employed in the contracts department for a heating and air conditioning company. Additionally, Ms. McLean works part-time for a law firm. Although they have only been involved in a relationship since 2017, Ms. McLean has known Mr. Whitton since 2011. For two and a half years prior to his arrest for the instant offense, Mr. Whitton resided with Ms. McLean in Locust Grove, Georgia.

*Physical Health*

Mr. Whitton is in good physical health.

*Mental and Emotional Health*

While living with his father in Fayetteville, Georgia, Mr. Whitton saw a therapist on a few separate occasions at 14 years old. During this time, Mr. Whitton believes he was diagnosed with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To treat the ▮▮▮▮, Mr. Whitton was prescribed ▮▮▮▮▮▮▮▮ by his family physician, Dr. Hood, in Stockbridge, Georgia. Mr. Whitton continued to take this medication throughout eighth and ninth grade, but decided to discontinue using the medication as he was experiencing weight loss. Then, at the age of 19, Dr. Hood prescribed Mr. Whitton ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which he continued to take until he reached the age of 26 until he lost his health insurance. At that point, Mr. Whitton began taking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which he used consistently for three (3) to four (4) years. At some point, Mr. Whitton falt as if he

was beginning to abuse the drug, so he chose to stop taking it. In time, Mr. Whitton returned to using ▓▓▓▓▓▓, which he had been taking for six (6) to eight (8) months prior to his arrest for the instant offense.

Mr. Whitton was not offered mental health treatment at the Robert A. Deyton Detention Facility. Mr. Whitton is amenable to treatment and feels it would be beneficial.

*Substance Abuse*

Mr. Whitton has a severe history of substance abuse, beginning at 16 years old when he started drinking alcohol once or twice per month while in high school. Unfortunately, this behavior escalated quickly and by the time Mr. Whitton was 21 years old, he was drinking beer and liquor five (5) days per week. By the time Mr. Whitton was 23 years old, he recognized the severity of his drinking habits, so he decreased his usage to only drinking once or twice per month. In addition, between the ages of 20 and 23, Mr. Whitton used marijuana approximately ten times. As previously discussed, between 2019 and 2020, Mr. Whitton abused his prescription Adderall medication. During this time, Mr. Whitton would take more medication than was prescribed for "performance enhancement" purposes as he was operating a business and working out. Mr. Whitton realized that he was suffering from drug abuse after a two (2) to three (3) month period when he only slept every other night. At that point, Mr. Whitton decided to stop taking the medication on his own, without the assistance of a treatment program.

Mr. Whitton was not offered substance abuse treatment at the Robert A. Deyton Detention Facility. Mr. Whitton is amenable to treatment and feels it would be beneficial.

*Education, Vocational and Special Skills/Employment Record*

In 2008, Mr. Whitton earned her high school diploma from Faith Academy in Stockbridge, Georgia (*See* Defense Exhibit D). After graduation, Mr. Whitton completed a six-month program

at National Personal Training Institution (NPTI) in McDonogh, Georgia in 2010. Here, he received certifications in Strength & Conditioning and Nutrition (*See* Defense Exhibit E). Mr. Whitton also expanded his knowledge by studying anatomy while in the program. Then, in 2011, Mr. Whitton received an Outdoor Fitness Boot Camp Specialty Certification from SCW Fitness Education (*See* Defense Exhibit F). Mr. Whitton also completed a weekend course at the CrossFit Atlanta gym and obtained a CrossFit Level I certification. Finally, in 2016, Mr. Whitton received a certificate from Elite Crete Systems acknowledging his title as a trained installer of Elite Crete Systems Products (*See* Defense Exhibit G).

Mr. Whitton consistently demonstrated a strong work ethic, as evidenced by his steady employment record. Beginning after graduation from high school, Mr. Whitton commenced his employment at Handy Randy in Ellenwood, Georgia. Here, he worked from 2009 to 2010 building greenhouses as a full-time employee and earning $25,000 annually. Mr. Whitton chose to resign from his position here to follow his passion of being a personal trainer. Thus, for six months in 2010, Mr. Whitton enrolled in the NPTI and chose to remain unemployed to focus on his studies.

After obtaining his certification, Mr. Whitton obtained employment as a personal trainer at Gold's Gym in McDonough, Georgia. From 2010 to 2011, Mr. Whitton worked here full-time earning between $40,000 and $50,000 annually. Then, in 2011, Mr. Whitton was presented with the opportunity to further his career as a personal trainer. From 2011 until 2013, Mr. Whitton rented a studio at CrossFit of Locust Grove in Locust Grove, Georgia where he was a personal trainer. Here, he had full-time employment and earned $50,000 annually. In 2013, Mr. Whitton decided to resign from this position to pursue a better opportunity.

Around 2013 or 2014, Mr. Whitton was a personal trainer at CrossFit Clash in McDonough, Georgia. Not only did Mr. Whitton work at CrossFit Clash, but he also helped establish the

company. Mr. Whitton was a fulltime employee at CrossFit Clash earning approximately $25,000 annually; however, he ended up leaving this position in 2016 or 2017 for a better opportunity. Around the same time, from 2015 to 2018, Mr. Whitton was also working as a foreman at Concrete Coating, a floor demolition company in Locust Grove, Georgia. Here, Mr. Whitton earned $50,000 annually, but chose to leave this company to pursue the opportunity of co-owning a business.

In 2017, Mr. Whitton pursued his goals and began co-owning Georgia Custom Enclosures, a fence building company, in McDonough, Georgia, with Michael Adams (hereinafter "Mr. Adams"). The company hired subcontractors for jobs rather than hiring employees. Mr. Whitton earned approximately $150,000 annually from this business. In 2019, Mr. Adams opened another business. Thus, from 2019 until the time of his arrest for the instant offense, Mr. Whitton owned and operated his own fence building company out of his home in Locust Grove, Georgia. Mr. Whittom had four full-time employees and he earned approximately $80,000 annually from the business.

Mr. Whitton maintains regular contact with his former employer, David Ogle, who is committed to providing Mr. Whitton with not only employment upon release, but also a separate fencing division of Valen Concrete Coatings which Mr. Whitton will manage (*See* Defense Exhibit H). Mr. Whitton's dedication and perseverance were evident in his past endeavors, and these qualities have propelled him towards past achievements and will continue to shape his future success.

### C.    The Need for the Sentence Imposed

The primary directive in 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2. 3553(a)(2) states that such purposes are:

      (a)        To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (b)        To afford adequate deterrence to criminal conduct;
      (c)        To protect the public from further crimes of the defendant; and
      (d)        To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Under 18 U.S.C. 3661, *no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence (emphasis added).

> *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

It is indisputable that the events on January 6, 2021, had a profound negative impact on the country and impression from the global community. Although it was not Mr. Whitton's intention to be engaged in criminal acts prior to travelling to Washington, D.C., he did. Mr. Whitton's intention was simply to support his girlfriend who desired to witness an historic event. While his motives were not politically driven, he does possess a genuine love for his country and shares the desire for a free and fair election, much like any other citizen.

Mr. Whitton now understands that his initial decision to enter the restricted grounds of the Capitol Building was made without careful consideration, leading to a chain of impulsive reactions and highly uncharacteristic behavior. Once situated outside the Archway, Mr. Whitton's conduct began to escalate further. Eventually, his behavior became disorderly, intensifying tensions and risking serious harm to others. His actions represented a significant departure from his usual behavior and had a detrimental impact on the overall situation. Mr. Whitton deeply regrets his actions and acknowledges the role he played in escalating tensions and endangering others. Mr. Whitton takes full responsibility for his behavior and does not shy away from being held

11

accountable. In hindsight, he views the events of that day in a completely different light and is surprised at how quickly his actions escalated.

Mr. Whitton's current circumstances have humbled him and led him to reflect on the gravity of his situation. He acknowledges the immense power of the law and the impact it can have on his life, particularly as he faces additional incarceration. It is worth noting that Mr. Whitton has no history of serving time in prison, making this experience a stark departure from his previous encounters with the legal system.

Since being detained, Mr. Whitton has gained a deep appreciation for the power of the law and the need to conduct himself within its boundaries. He now understands the loss of freedom and the toll it has taken on his family. As a result of reflecting on his actions and the consequences they have brought, Mr. Whitton has developed a deep respect for the law. The time he has spent contemplating the impact of his choices has made him keenly aware of the importance of abiding by and upholding the law in society.

*To Afford Adequate Deterrence to Criminal Conduct*

Mr. Whitton's very limited criminal history does not demonstrate an extensive record of serious offenses. Mr. Whitton has reflected on his past and better understands the causes of his behavior. Mr. Whitton has found a sense of purpose through training his fellow inmates in CrossFit, while also educating them on the dangers of K2, a synthetic cannabinoid. Mr. Whitton is proud to state that he believes his education has steered multiple inmates away from utilization of the drug. These activities have allowed him to reflect on his life, address suppressed traumas, and seek personal healing.

In hindsight, Mr. Whitton recognizes the hardships his family and Ms. McLean have endured and regrets the pain they have experienced. However, he views his circumstances as an

opportunity for personal growth and transformation. By confronting his inner demons, he is emerging as a stronger and improved version of himself.

While detained, Mr. Whitton has received unwavering support from Ms. McLean, who remains steadfastly committed to standing by his side. She has shown a genuine effort to understand his past traumas, gain a deeper understanding of his personal struggles, and offer her support as he embarks on a journey of personal growth. While Ms. McLean remains committed and supportive, she also plays a vital role in holding Mr. Whitton accountable for his progress. She expects him to continue making positive changes and strives to ensure that he remains on the path of personal growth and improvement. She as well has faced many struggles as a result of Mr. Whitton's detention and committed to positive change for the well-being of herself and Mr. Whitton. Ms. McLean is prepared to provide a foundation of support for Mr. Whitton upon his release (*See* Defense Exhibit I).

Mr. Whitton is fortunate to have a strong support structure. He is a determined individual, is committed to taking the necessary steps every day to better himself and maintain sobriety. He is resolute in avoiding any situation that may lead to legal consequences or disappoint his family in the future.

### D.    The Need to Provide Restitution to any Victims of the Offense

The directives of 18 U.S.C. § 3553(a) outlines the factors to be considered imposing a sentence that is sufficient, but not greater than necessary to satisfy the purposes of sentencing. Under 3553(a)(7), a factor to be considered is the need to provide restitution to any victims of the offense.

Mr. Whitton understands that providing restitution to the identified victims in this case is necessary. To best provide restitution to each victim, Mr. Whitton will continue his longstanding track record of hard work and employment.

## Conclusion

Although the case before this Court carries significant gravity, it is important to acknowledge that Mr. Whitton does not pose a threat to society in terms of his actions or beliefs. Mr. Whitton has been the underdog since he was a young boy. He has been the victim of severe bullying, and various forms of abuse. Mr. Whitton fully acknowledges the seriousness of his actions and the profound impact they had on fellow citizens, law enforcement, and the government. Mr. Whitton expresses sincere remorse and is fully prepared to face the consequences of his behavior. He genuinely regrets his past actions, has developed a profound respect for the law, and has been effectively deterred from engaging in future criminal conduct.

Mr. Whitton respectfully requests the consideration of the within 3553(a) factors and/or variances for a sentence below the guideline range. Furthermore, he reserves the right to supplement and/or address any additional or relevant sentencing issues at the appropriate time.

In support of his argument, Mr. Whitton has submitted several character letters (collectively marked as Defense Exhibit J).

                                                                               Respectfully submitted,

                                                                               *s/ Komron Jon Maknoon*
                                                                               Komron Jon Maknoon, Esquire
                                                                               PA I.D. NO. 90466

                                                                               MAKNOON & ASSOCIATES, LLC.
                                                                               438 Division St., 2nd Floor
                                                                               Sewickley, PA 15143

                    (412) 201-1802
                    (412) 774-8424 FAX

                    Attorney for Defendant, Jack Wade Whitton